

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00174-CR
No. 02-21-00175-CR
No. 02-21-00176-CR

_____

EMANUEL OCHOA, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court Nos. CR19-00054, CR19-00056, CR19-00057

---

Before Birdwell, Womack, and Wallach, JJ.
Opinion by Justice Wallach

## OPINION

Appellant Emanuel Ochoa was convicted of three offenses—aggravated sexual assault of a child under six years old, injury to a child causing serious mental injury, and aggravated kidnapping—all related to the sexual assault of five-year-old Isabelle.[1] In four issues, Ochoa challenges the trial court's denial of his motion to suppress his oral statements, which he contends were obtained by coercion and in violation of the Texas Family Code (issue one); the trial court's failure to suppress evidence obtained as a result of his statements (issue two); the trial court's denial of his motion for mistrial based on the prosecutor's closing argument remarks, which Ochoa argues were a comment on his failure to testify (issue three); and the constitutionality as applied of two statutes that subjected him to the possibility of a sentence that the jury did not ultimately impose (issue four). Because we hold that the trial court did not err by denying his suppression motion, that the prosecutor's closing argument was not a comment on Ochoa's failure to testify, and that the challenged statutes are not unconstitutional as applied, we will affirm the trial court's judgment.

### Background

On the morning of February 6, 2018, Isabelle was discovered to be missing from the mobile home in which she lived with her family. Also living in the mobile

---

[1]We use a pseudonym for the complainant to protect her privacy. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

home were Ochoa and his mother. They had moved in temporarily after being evicted from the home a few doors down. Ochoa was fourteen at the time.

Law enforcement was called and began a search, but Isabelle was not located until the afternoon, when she was found under another nearby mobile home. She had been sexually assaulted, strangled, and left out in subfreezing temperatures. She was wearing a nightgown but no underwear. A trash bag had been wrapped around her and a blanket placed over her. She was initially alert and told an EMT that she had been playing hide and seek with someone who had put her under the house.[2] At another point, she said something like, "I don't know why he is on me," but she did not identify who "he" was. At the hospital, she began to show indications of brain injury, and an MRI showed signs of hypoxic injury to the brain.

Law enforcement officials asked the two people who had found Isabelle—Ochoa and a man named Jeremiah Jacques, who also lived in the trailer with Isabelle's family—to come to the station for questioning. Both were interviewed by Texas Ranger James Holland. Holland spoke with Ochoa both before and after Ochoa was advised of his rights by a magistrate. Ochoa eventually confessed to Holland that on the morning that Isabelle went missing, he had gone into her room at 5 a.m., put a blanket over her head, and taken her to the mobile home where he had recently lived.

---

[2]The EMT testified that she said two names, which sounded like "Hakea" and "Davine," but that Isabelle was so soft-spoken that she was not sure what names or words Isabelle had said.

He told Holland that once there, he raped Isabelle, and because she was screaming and crying, he hit her on the back of the head. He then put her under the nearby home where she was later found and covered her with a blanket. A sample taken from inside the fly of Ochoa's underwear contained DNA from two people, and Isabelle could not be excluded as a contributor.

After the juvenile court transferred Ochoa to district court for criminal proceedings, *see* Tex. Fam. Code Ann. § 54.02, he was charged with aggravated sexual assault, injury to a child, and aggravated kidnapping, and a jury convicted Ochoa of all three charges. The jury assessed punishment at forty-five years' confinement for the aggravated sexual assault, fifty-five years' confinement for the injury to a child, and twenty years' confinement for the aggravated kidnapping; the trial court sentenced Ochoa accordingly and ordered the sentences to run concurrently. Ochoa then filed a motion for new trial in each case. In the motion filed in trial court cause number CR10-0054, the aggravated sexual assault case, Ochoa argued that Texas Penal Code Section 22.021 and Texas Government Code Section 508.145 are unconstitutional as applied to him because they subjected him to a possible sentence of life imprisonment without the possibility of parole, an unconstitutional sentence. The motions were overruled by operation of law. *See* Tex. R. App. P. 21.8(c).

## Discussion

### I. Motion to Suppress

In Ochoa's first issue, he argues that the trial court erred by denying his motion to suppress his oral statements and that he was harmed because of the court's error. More specifically, he contends that the part of the interview with Holland that took place before the magistrate advised him of his rights should have been suppressed because it was a custodial interrogation and he had not been advised of his rights; that the post-warnings statement also should have been suppressed because the magistrate incorrectly advised Ochoa of his rights, rendering the statement involuntary; and that the statement should have been suppressed because it was the result of promises made to Ochoa by Holland. In his second issue, Ochoa argues that because his statements were involuntary, the trial court erred by failing to suppress evidence discovered because of the statements.

In response, the State asserts that Ochoa's pre-warnings and post-warnings statements are admissible because Ochoa was not in custody when he made the pre-warnings statement and because the post-warnings statement was made after Ochoa knowingly, intelligently, and voluntarily waived his rights. The State further argues that the fruit-of-the-poisonous-tree doctrine is inapplicable, even if the post-warnings statement was improperly admitted, because no coercion or improper police conduct was present and because other trial evidence is sufficient to uphold the conviction.

## A. Background

At the start of Holland's interview of Ochoa, Holland said that Ochoa was free to leave at any time. Ochoa sat in the corner of the interview room, with a table to his left, a chair to his right, and Holland directly in front of him. From the layout of the room and where the two were sitting, Ochoa would have had to either move a chair or ask Holland to back up out of the way if he wanted to leave. However, in the video, the door to the room appeared unlocked; Holland left the room at several points without waiting for it to be opened by someone else from the outside, and at one point when he was alone in the room, Ochoa opened the door and spoke with someone outside the room.

During the interview, Holland repeatedly said that he could help Ochoa, and he said that when a person owns up to his mistake, "[i]t doesn't have to be this horrible, bad thing. No one's going to yell at that person." He told that to Ochoa several times and also said that it is important to own up to one's mistakes. Toward the end of the first part of the interview—before Ochoa had been advised of his rights—Holland's questioning suggested that he suspected Ochoa's involvement in what had happened. Holland said that he did not put fourteen-year-olds in jail, that he did not think the case was a kidnapping case, and that he believed "the whole thing was a mistake" that "kinda got out of control." He then said that he thought that maybe Ochoa had made a mistake. He asked why Ochoa's dark-colored pants had bleach stains, which Ochoa explained were from cleaning several weeks before. Ochoa said that he had washed

the pants after that cleaning, but Holland, moving close to Ochoa and putting a hand on each of Ochoa's knees, told Ochoa that he could smell the cleaning supplies on the pants. He further stated that Ochoa had already made a Freudian slip[3] in the interview and that he could help Ochoa "through this thing." He further stated that if Ochoa were to make amends, "I promise you, I will help you through it. . . . I'm here to help you." He then told Ochoa, "I didn't know that you did this before you came in here."

Holland spent the next few minutes urging Ochoa to talk to him and telling Ochoa that the complainant was talking about what had happened. Ochoa did not respond except to say that he had not done anything. After several minutes of Ochoa's not saying anything, Holland offered to get him something to drink or eat— Ochoa declined—and he then left the room. Holland explained at the hearing on Ochoa's motion to suppress that he had left the room because he received a text from Cooke County Detective Jerry Crumley that it would be a good idea to call in the magistrate. After about fifteen minutes, Holland came back in and told Ochoa that he was bringing someone in to help Ochoa and to explain to Ochoa what his rights were. After making some small talk with Ochoa, Holland again left the room.

After about an hour, Ochoa's mother came into the room with Carroll Johnson, judge of Justice Court Precinct 2 in Cooke County. Johnson had been called

---

[3]Ochoa said that he hoped that Isabelle had not been raped, and Holland considered that a Freudian slip.

in to act as magistrate and provide the warnings required by Texas Family Code Section 51.095, which must be given before a minor child's written or recorded oral custodial statement may be admitted at trial. *See* Tex. Fam. Code Ann. § 51.095(a)(1), (5), (d). Johnson advised Ochoa and his mother that he knew nothing about the case and knew only that "they wanted to talk to [Ochoa] as a witness; he's not here under any charges." He advised Ochoa and his mother that even a witness has "the opportunity to be protected as the law allows." Johnson informed Ochoa that any time Ochoa came in contact with a police agency in any way, he had the right to remain silent and not make any statement at all and that anything Ochoa said could be used as evidence in the future. He then said, "I'm not saying that it would, you just have to be aware that anything you say could come back—you could be asked to talk about it or verify it at a later point in time."

Regarding Ochoa's right to an attorney, Johnson told him he had the right to hire an attorney and to have that attorney present to advise him "either prior to any questioning or during any questioning" and that if he was unable to hire an attorney, one could be provided for him. Johnson then stated, "Where that really comes in is if you are charged with a—uh—any kind of a crime, no matter what it might be, if you are going to be in [a Cooke County court], those judges are required . . . to appoint you an attorney" if asked. Ochoa's mother then asked if an appointed lawyer would be on the side of the State, and Johnson assured her that was not the case and explained how representation works with appointed attorneys. Johnson then again

8

told Ochoa that he had the right to have an attorney to "counsel [him] before or during any interview with police officers or attorneys representing the State." Finally, he informed Ochoa of his right to terminate the interview at any time. Johnson then asked Ochoa if he understood everything that had been explained to him and if he had any questions. Ochoa and his mother shook their heads no.

After Johnson left, Holland resumed his interview of Ochoa. During the interview, Holland told Ochoa, "You're a juvenile. There's no reason on this deal that you shouldn't be adjudicated as a juvenile. Basically what that means is they're gonna get you help. You're not going off to prison or any horrible thing like that." However, he followed up those statements by adding that what happened in the case was the decision of the "people in the district attorney's office," whose decision could be affected "if they see that there is no remorse—in other words, if you're not sorry for it, then they don't look at you like a 14-year-old kid." He added, "This could go bad. But it doesn't have to. And there's no reason it should." After these warnings and during the remaining part of the interview, Ochoa confessed.

The grand jury indicted Ochoa of intentionally or knowingly causing the penetration of the sexual organ of Isabelle, a child under six years of age, with his sexual organ; intentionally and knowingly causing serious mental deficiency, impairment, or injury to Isabelle, a child under fourteen, by strangulation, physical assault, or both; and intentionally and knowingly abducting Isabelle with the intent to

9

facilitate the commission of a felony, namely aggravated sexual assault, or to facilitate his flight after the attempt or commission of the felony.

Ochoa filed a motion to suppress his oral statements, which he asserted were involuntary custodial statements. He asked the court to suppress all of his oral statements "as well as the statement of any alleged co-conspirators, co-defendants[,] or accomplices" obtained as a result of the statement taken from him. In a brief in support of his motion, Ochoa specified that he wanted the court to suppress both the pre-warnings and post-warnings statements that he had given to Holland.

The motion asserted that the first part of Ochoa's interview was a custodial interrogation, which required magistrate warnings. As for the post-warnings statements, Ochoa contended that the warnings had deficiencies that rendered the statement involuntary. Specifically, he complained that the magistrate (1) said that Ochoa was there only as a witness; (2) after advising Ochoa that his statements might be later used against him, said that Ochoa had to be aware that he could be asked about his statements or asked to verify them at a later time; (3) and said that "where [the right to an attorney] really comes in is" if Ochoa were to be charged with a crime and were going to court.

The State filed a response to the motion. The trial court then held a hearing at which Johnson and Holland were called to testify. The State also provided the trial court with a copy of the interview video.

Johnson stated that neither Ochoa nor his mother expressed any concern about their understanding of the rights that he had explained to them. Johnson did not perceive Ochoa to be coerced or threatened or in a state of mind that would have rendered him incapable of waiving his rights. Ochoa did not appear to be under the influence or to be injured, and he was attentive to Johnson's statements. Johnson further testified that he had advised Ochoa that Ochoa was there as a witness because that was the information that he (Johnson) had been given.

Holland testified that Ochoa had come to the sheriff's office with his mother, that Ochoa had not been handcuffed before or during the interview, that he told Ochoa that Ochoa could leave whenever he wanted to, and that Ochoa never asked for an attorney or to stop the interview. Holland acknowledged that at one point he had told Ochoa that there was no reason that the case should not be tried as a juvenile matter, but he also said that he had told Ochoa that it was not his decision. Holland stated that the interview-room door was unlocked, and the video of the interview supported that testimony. Ochoa was offered something to drink and eat and a bathroom break. Holland agreed that he had told Ochoa multiple times that he could help and that as the interview went on, he moved closer to Ochoa and at times put his hands on Ochoa's knees and his shoulders.

After the hearing, the trial court denied the motion. At trial, the State admitted and published the video exhibit of Ochoa's confession, and Holland testified about the interview and Ochoa's confession.

**B. Standard of Review**

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

**C. Pre-Warnings Statement**

Ochoa argues that the part of the interview prior to the magistrate's arrival should have been suppressed because he had not yet received the warnings required

by Texas Family Code Section 51.095. That section governs the admissibility of custodial statements made by juveniles. Tex. Fam. Code Ann. § 51.095; *Vega v. State*, 84 S.W.3d 613, 616 (Tex. Crim. App. 2002). But for the protections of that section to preclude admission of a juvenile's statement, the statement must have been made during custodial interrogation. Tex. Fam. Code Ann. § 51.095(b), (d); *Matthews v. State*, 513 S.W.3d 45, 62 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). We therefore begin with a determination of whether Ochoa was in custody for the part of the interview before he received the magistrate's warnings.

A person is in custody when, under the circumstances surrounding the interrogation, a reasonable, innocent person would believe that their freedom of movement was restrained to the degree associated with a formal arrest. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 821 (2022); *see also Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995) (determining custody issue by considering the circumstances surrounding the interrogation and whether, given those circumstances, a reasonable person would have felt that he or she was not free to terminate the interrogation and leave). The custody determination "is based entirely upon objective circumstances," *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996), and "only the objective circumstances known to the detainee should be considered in deciding what a reasonable person in [the detainee's] position would believe," *State v. Ortiz*, 382 S.W.3d 367, 373 (Tex. Crim. App. 2012). When the

13

person is a juvenile, the "reasonable person" is a reasonable child of the same age. *Martinez v. State*, 337 S.W.3d 446, 455 (Tex. App.—Eastland 2011, pet. ref'd).

Courts generally consider four objective circumstances relevant to determining custody: (1) probable cause to arrest; (2) the focus of the investigation; (3) the subjective intent of the law enforcement officers conducting the interview, to the extent that intent is manifested in words or actions; and (4) the subjective belief of the defendant, to the extent that belief is manifested in words or actions. *Dowthitt*, 931 S.W.2d at 254; *see also Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529 (1994) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). When dealing with a juvenile, the child's age is also an objective circumstance to consider if the law enforcement officers knew the child's age at the time of the interview or the child's age "would have been objectively apparent to any reasonable officer." *J.D.B. v. North Carolina*, 564 U.S. 261, 274, 131 S. Ct. 2394, 2404 (2011); *cf. Martinez*, 337 S.W.3d at 455.

Considering those circumstances, the Court of Criminal Appeals has set out a nonexhaustive list of four general situations that constitute custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way;

> (2) when a law enforcement officer tells the suspect that he or she cannot leave;

(3) when law enforcement officers create a situation that would lead a reasonable person to believe that his or her freedom of movement has been significantly restricted; and

(4) when there is probable cause to arrest, law enforcement officers do not tell the suspect that he or she is free to leave, and the officer's knowledge of probable cause is manifested to the suspect by the officer or from the suspect to the officer.

*Dowthitt*, 931 S.W.2d at 255; *see also Ortiz*, 382 S.W.3d at 376 (stating that the four circumstances outlined in *Dowthitt* are not the only circumstances under which a person will be considered to be in custody). However, each of these situations requires something more to establish custody. For the first three situations, custody does not exist unless "the restriction upon freedom of movement . . . amount[s] to the degree associated with an arrest as opposed to an investigative detention." *Dowthitt*, 931 S.W.2d at 255. For the fourth situation, custody exists only if the manifestation of probable cause, "combined with other circumstances, would lead a reasonable person to believe that he [or she] is under restraint to the degree associated with an arrest." *Id.*

The second and fourth situations did not exist in this case because Holland told Ochoa at the start of the interview that he was free to leave. *See id.* The other two circumstances also did not exist because Ochoa's freedom of movement was not restricted in a manner associated with arrest. *See id.*

Holland testified at the suppression hearing that before he interviewed Ochoa, he had also interviewed Jeremiah Jacques, the man who, along with Ochoa, had found

15

Isabelle. Holland stated that during the first part of the interview of Ochoa, he would not have been comfortable placing Ochoa under arrest because "[t]here would [have] be[en] absolutely no reason to." *See Turner v. State*, 685 S.W.2d 38, 42 (Tex. Crim. App. 1985) (considering whether the appellant was in custody during fact-finding police interview and noting that "appellant may have been *a* focus of the investigation, but he was certainly not *the* focus of the investigation"). Only during the interview did Ochoa "becom[e] more interesting" to Holland, leading him and the other investigators to believe that Ochoa was a suspect and that the magistrate should be called in to give Ochoa the required warnings.

Ochoa and his mother had gone to the interview voluntarily, and no evidence at the suppression hearing indicated that the police had handcuffed Ochoa or taken him to the police station by himself in a police car.[4] *See id.* (noting fact that the appellant had asked officers for a ride to the police station for interview as factor in concluding appellant had not been in custody); *see also Dancy v. State*, 728 S.W.2d 772, 778 (Tex. Crim. App. 1987) ("[A] defendant's presence at a police station by consent does not change into arrest by virtue of an officer's subjective view alone that the

_____

[4]At the hearing on Ochoa's motion to suppress, the prosecutor told the trial court that law enforcement officers had driven Ochoa and his mother together to the station in an unmarked police car and that Ochoa had not been handcuffed and had sat in the front seat of the car for the ride. There was no testimony at the hearing regarding those assertions. At trial, however, the law enforcement officer who had provided the ride testified that he had driven Ochoa and his mother to the station because the family did not have access to a vehicle, that Ochoa rode next to him in the front seat, and that Ochoa had not been in handcuffs for the ride.

defendant was not free to leave absent an act indicating an intention to take the defendant into custody."). Ochoa was not handcuffed during the interview, and the interview-room door was not locked. *See Gonzales v. State*, 467 S.W.3d 595, 605 (Tex. App.—San Antonio 2015, pet. ref'd) ("Merely being questioned by an officer, even when the officer has reason to believe the juvenile is involved in a criminal activity, does not constitute custody."). There is no evidence that Ochoa's mother requested to be present during the pre-warnings part of the interview but was blocked from doing so. *See In re D.J.C.*, 312 S.W.3d 704, 714 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (concluding that officer conducting the interview signaled the change from noncustodial to custodial interview when the officer excluded the defendant's grandmother from the interview room, "despite her express request to be present, [had] the magistrate judge read appellant his rights, [and] then return[ed] to the interview room and lock[ed] it"). Further, as noted, Holland told Ochoa at the beginning of the interview that he could leave at any time.

Even outside of the four general circumstances indicating custody outlined in *Dowthitt*, consideration of the general objective factors relevant to a custody determination does not support a conclusion that Ochoa was in custody for the pre-warnings part of his interview. The record includes no evidence indicating that at that point, law enforcement had probable cause to arrest Ochoa. He had not yet become the focus of law enforcement's inquiry. No words or actions reflected a belief on Ochoa's part that he was not free to terminate the interview and leave. Further,

17

nothing in the words and actions of any law enforcement official up to that point indicated an intent to arrest Ochoa or prevent him from leaving.

Certainly, some of the circumstances of the interview could have made Ochoa *subjectively* feel that his movements were in some way restricted. Ochoa was young. *See J.D.B.*, 564 U.S. at 272, 131 S. Ct. at 2403 (observing that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go"). Holland's questioning in this part of the interview, particularly toward the end of it, suggested his belief that Ochoa was a suspect. Holland told Ochoa that he thought what had happened was a mistake and that Ochoa had made a mistake, that he could smell cleaning supplies on Ochoa's pants, that Ochoa had already made a Freudian slip in the interview, and that he "didn't know that [Ochoa] did this before [he] came in" to the interview room. *See Dowthitt*, 931 S.W.2d at 255. Ochoa was alone in the room with Holland, who was armed. *But cf. McCreary v. State*, No. 01-10-01035-CR, 2012 WL 1753005, at *5 (Tex. App.—Houston [1st Dist.] May 17, 2012, no pet.) (mem. op., not designated for publication) (noting that a juvenile may be in custody when interrogated alone by an armed officer in an enclosed space, depending on other relevant circumstances). Holland sat in front of and very close to Ochoa and at times put his hand on Ochoa, and when Ochoa would look away or look down, Holland instructed Ochoa to look at him. The room was quite small, and its configuration meant that Ochoa could not have left the room while Holland was speaking to him without moving or climbing

18

over a chair blocking the path to the door or telling Holland to move out of the way.[5] However, even under these circumstances, whatever Ochoa may have subjectively felt, he was not under a restraint of freedom to the degree associated with a formal arrest, and the circumstances were not such that a reasonable, innocent person Ochoa's age would have believed that he was.

Based on the objective circumstances, we hold that Ochoa was not in custody for the pre-warnings part of the interview. *See Turner*, 685 S.W.2d at 43; *see also Spencer v. State*, No. 01-07-00717-CR, 2009 WL 2343212, at *9 (Tex. App.—Houston [1st Dist.] July 30, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding that a 15-year-old in the appellant's situation would not have considered himself under restraint to the degree associated with an arrest). Accordingly, Section 51.095 did not apply to that part of the interview, and Ochoa was not entitled to have the prewarnings statements suppressed for failure to comply with the statute. We overrule this part of Ochoa's first issue.

**D. Post-Warnings Statement**

Ochoa argues that the remainder of his statement was inadmissible because he was in custody for the remainder of the interview, and the magistrate misadvised him of his rights, rendering the post-warnings statement involuntary. He further argues

---

[5]Ochoa asserts that in part of the interview, he got down onto the floor in a fetal position. The video shows that Ochoa did curl up on the floor at one point, but it was not while he was being interviewed. It happened after he had confessed and Holland had left the room.

that his statement was involuntary because of Holland's promises to him. We will assume for purposes of our analysis that during the entirety of the post-warnings part of the interview, Ochoa was in custody. *See D.J.C.*, 312 S.W.3d at 713 (noting that an interview that begins as noncustodial can become custodial).

### 1. Voluntariness Standards

Under the due process clause of the Fourteenth Amendment and *Miranda*[6] the admission of an involuntary statement into evidence is prohibited. *Compton v. State*, 666 S.W.3d 685, 720 (Tex. Crim. App. 2023); *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008); *Herring v. State*, 359 S.W.3d 275, 279 (Tex. App.—Texarkana 2012), *aff'd*, 395 S.W.3d 161 (Tex. Crim. App. 2013). Texas law also provides protection against the admission of involuntary statements. *See* Tex. Fam. Code Ann. § 51.095(a)(1)(B), (a)(5)(A); *see also* Tex. Code Crim. Proc. Ann. art. 38.22.

A statement may be involuntary under the due process clause or under *Miranda* only if there is police overreaching such that a suspect's will "has been overborne and his [or her] capacity for self-determination critically impaired." *Sandoval v. State*, 665 S.W.3d 496, 523 (Tex. Crim. App. 2022) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 2044 (1973); *Oursbourn*, 259 S.W.3d at 169; *see also Colorado v. Connelly*, 479 U.S. 157, 167–70, 107 S. Ct. 515, 522–23 (1986) (stating that coercive police activity "is a necessary predicate" to determining that a confession is

---

[6]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

not voluntary within the meaning of the Due Process Clause or that a defendant did not voluntarily waive his or her *Miranda* rights); *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (stating that in analyzing whether a person waived *Miranda* rights, the first part of the standard is determining whether the relinquishment of the rights was the product of a free and deliberate choice rather than intimidation, coercion, or deception). A state-law claim for involuntariness, on the other hand, can be predicated on police overreaching, but it does not have to be. *Oursbourn*, 259 S.W.3d at 172 (addressing involuntariness claim based on Tex. Code Crim. Proc. Ann. arts. 38.21 and 38.22).

In determining voluntariness, courts look at the totality of the circumstances. *Griffin v. State*, 765 S.W.2d 422, 429 (Tex. Crim. App. 1989). While due-process and *Miranda* involuntariness claims involve an objective assessment of police behavior and generally do not require "sweeping inquiries into the state of mind of a criminal defendant who has confessed," a state-law involuntariness claim, on the other hand, could involve that type of inquiry. *Oursbourn*, 259 S.W.3d at 171 (quoting *Connelly*, 479 U.S. at 167, 107 S. Ct. 515). Such an inquiry focuses on the suspect's subjective mental state. *Id.* at 181.

Factors relevant to determining whether a confession was coerced include, but are not limited to, "the youth of the accused, his lack of education or his low intelligence, the lack of any advice about constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical

punishment such as the deprivation of food or sleep." *Sandoval*, 665 S.W.3d at 523 (quoting *Schneckloth*, 412 U.S. at 225, 93 S. Ct. at 2044. "But even with these factors, an essential element of any due-process [or *Miranda*] involuntariness claim is law-enforcement overreaching." *Id.*; *Connelly*, 479 U.S. at 170, 107 S. Ct. at 523 (addressing *Miranda* voluntariness standard). Factors relevant to whether a confession is involuntary under state law include whether the statement was made "under the duress of hallucinations, illness, medications, or even a private threat," or if the suspect "lacked the mental capacity to understand his rights or if, due to a temporary mental condition, he [or she] did not understand" to what he or she was confessing. *Sandoval*, 665 S.W.3d at 526 (quoting *Oursbourn*, 259 S.W.3d at 172). "But 'youth, intoxication, mental retardation, and other disabilities are usually not enough, by themselves, to render a statement inadmissible.'" *Id.*

We review the trial court's decision to admit a statement over a voluntariness objection for an abuse of discretion. *Compton*, 666 S.W.3d at 721. Once Ochoa raised the question of voluntariness, the State had the burden to prove by a preponderance of the evidence that his statement was freely given. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). *Cf. State v. Terrazas*, 4 S.W.3d 720, 725 (Tex. Crim. App. 1999) (noting that the State has no burden to show voluntariness until the defendant has presented evidence raising a voluntariness question).

In Ochoa's motion to suppress, he asserted that his interview violated Texas Family Code Section 51.095, Texas Code of Criminal Procedure Article 38.22,[7] his right to due process under the Fourteenth Amendment, and his Fifth Amendment right to remain silent. On appeal, he does not specifically refer to the Fourteenth or Fifth Amendment, and his first issue challenging the voluntariness of his statement does not reference *Miranda*'s procedural protections of his Fifth Amendment rights. He does, however, argue that his statement was not voluntary because it was coerced by Holland and because Johnson misadvised him of his rights under Section 51.095. We therefore construe his brief to argue that because of Holland's conduct in conducting the interview, Ochoa's statement was not voluntary under the Due Process Clause,[8] and that because Johnson misadvised him of his Section 51.095 rights, his statement was involuntary under Texas law.

---

[7]Ochoa does not mention Article 38.22 in his brief. Because Ochoa was a juvenile at the time of the interview, the Family Code governed the admissibility of his statement, not Article 38.22. *State v. Torres*, 666 S.W.3d 735, 741 (Tex. Crim. App. 2023) (stating that "even though [the appellant's] juvenile case was ultimately transferred to a district court to try him as an adult in a criminal proceeding, Section 51.095 . . . governs the admissibility of [his] statements"); *see also Griffin*, 765 S.W.2d at 427 ("[I]ssues involving substantive rights of pretransfer juveniles, such as legality of detention or a confession, though raised in the criminal forum, shall be controlled by applicable provisions of the Family Code."); *Vega*, 84 S.W.3d at 616 (noting that although Article 38.22 and the juvenile provisions of the Family Code "deal with the same general subject, the persons involved and the objectives of the two provisions are different," and thus "the sections of the Family Code relevant to confessions prevail over [Article] 38.22").

[8]Although Ochoa's first issue does not reference *Miranda*, if there is no coercion for purposes of due process, then there was likewise no coercion that would

23

## 2. Magistrate Warnings

Texas Family Code Section 51.095(c) requires that before a juvenile's recorded oral statement while in custody is admissible, a magistrate must provide the child with a *Miranda*-based warning that

> (i) the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child;
>
> (ii) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;
>
> (iii) if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and
>
> (iv) the child has the right to terminate the interview at any time.

Tex. Fam. Code Ann. § 51.095(a)(1)(A), (5), (c), (d); *see Meadoux v. State*, 307 S.W.3d 401, 408 (Tex. App.—San Antonio 2009), *aff'd*, 325 S.W.3d 189 (Tex. Crim. App. 2010).

Here, the magistrate read to Ochoa each right listed in Section 51.095, and in that respect, the magistrate complied with Section 51.095. *See Roquemore v. State*, 60 S.W.3d 862, 868 (Tex. Crim. App. 2001) (requiring compliance with Section 51.095 for admission of a juvenile's statement); *In re B.B.*, 567 S.W.3d 786, 790 (Tex.

---

make the statement involuntary under *Miranda*. *See Oursbourn*, 259 S.W.3d at 169–70 (noting that both due-process and *Miranda* involuntariness claims require police overreach).

App.—San Antonio 2018, no pet.). But the magistrate then added additional explanations of his own for some of those rights, and the question for this court is whether the additional language he added rendered the otherwise accurate warnings insufficient so as to make Ochoa's post-warnings statement involuntary.

Ochoa first complains that the magistrate advised him that he was only a witness in the case. Ochoa had been brought to the station to be questioned as a witness, not a suspect, but by the time Johnson was brought in as magistrate, Holland had begun to suspect Ochoa's involvement in the offense. However, Section 51.095 does not have a separate set of warnings for persons interviewed as witnesses rather than suspects, and Ochoa does not explain how his status as witness or suspect changes the warnings that he was entitled to receive under Section 51.095 or means that his statement was not freely given. Further, Johnson told Ochoa that he had the same rights any time that he came in contact with law enforcement in any way, and Johnson provided Ochoa with the same warnings required to be given in any custodial interrogation.[9]

Ochoa further complains about Johnson's manner of informing him about his right to an attorney. He recognizes that Johnson told him that he had the right to an

---

[9]Ochoa points out that at the suppression hearing, Johnson answered "Yes. Very definitely," when asked if he would distinguish "someone who [was] there as a witness versus someone who [was] there as a suspect." But Johnson did not testify that he would make a distinction in the warnings he provided, and he told Ochoa that witnesses and suspects had the same rights.

attorney during questioning, but he points to Johnson's additional statement that "[w]here that really comes in is if you are charged with a—uh—any kind of a crime, no matter what it might be, if you are going to be in [a Cooke County court], those judges are required . . . to appoint you an attorney" if asked. Ochoa asserts that "[i]t is not a correct clarification by a judge to tell a suspect the right to counsel comes into play when he's been charged with a crime and when he goes to court." We share Ochoa's concern about Johnson's language at this point of the warning. However, we do not look at Johnson's statement in isolation. Johnson followed that statement by again telling Ochoa that he had the right to have an attorney to counsel him "before or during any interview with police officers or attorneys representing the State." Accordingly, we reject Ochoa's argument that Johnson's additional explanation made the warning insufficient or rendered Ochoa's statement involuntary.

Ochoa also complains about Johnson's informing him that any statement he made could be used as evidence but then telling him, "I'm not saying that it would, you just have to be aware that anything you say could come back—you could be asked to talk about it or verify it at a later point in time." Ochoa argues that with this wording, Johnson "downplayed the possible impact of any statement [that Ochoa] made later being used against him." *See In re D.J.C.*, 312 S.W.3d 704, 721 (Tex. App.— Houston [1st Dist.] 2009, no pet.) (holding warning did not comply with Section 51.095 because it did not advise juvenile that his statement could be used as evidence against him). We disagree. Although this unnecessary additional language did not

26

address the fact that Ochoa's statement could be used as evidence—possibly because Johnson had been told that Ochoa was there only as a witness—Johnson had already expressly told Ochoa that "anything" he said could be used as evidence against him. We hold that Johnson's additional language did not make Ochoa's decision to confess one that was not freely given.

Ochoa cites *Diaz v. State*, 61 S.W.3d 525, 528–29 (Tex. App.—San Antonio 2001, no pet.), for the proposition that the magistrate gave him incorrect information and thereby rendered his confession involuntary. In that case, the magistrate told sixteen-year-old Diaz that he risked a maximum punishment of a one-year sentence if he were tried as an adult. *Id.* at 528. In reality, the possible sentence was up to ninety-nine years. *Id.* The court in that case held that the inaccurate information made Diaz's case "analogous to cases in which a defendant is unable to appreciate the actual value of his plea bargain because the maximum punishment he risked without the bargain was overstated in the court's admonition, rendering the plea involuntarily entered." *Id.* The court thus held that the incorrect information plus Diaz's youth rendered his statement involuntary. *Id.* at 529. Here, the magistrate did not give Ochoa unnecessary, incorrect information about his possible punishment or the consequences of making a statement. *Diaz* is therefore distinguishable. We reject Ochoa's challenges to the warnings provided to him by Johnson.

### 3. Holland's Assertions

Finally under this issue, Ochoa argues that his statement was involuntary because it was induced by Holland's promises. Ochoa notes that Holland repeatedly said that he wanted to help, and Ochoa asserts that in the post-warnings part of the interview, Holland promised that he would not be adjudicated as an adult. As noted above, we construe this part of his brief as asserting that his federal due process rights were violated by police overreach.

"A promise made by a law enforcement officer may render a confession involuntary if it was positive, made or sanctioned by someone with apparent authority, was of some benefit to the defendant[,] and was of such a character as would likely cause a person to speak untruthfully." *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1994); *see also Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). Our analysis of this issue ends at the first element because Holland did not make an unqualified promise to Ochoa. *See Coleman v. State*, 440 S.W.3d 218, 224 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding officer did not make an unequivocal promise that defendant would not go to jail or would receive only probation); *see also Wayne v. State*, 756 S.W.2d 724, 730, 734 (Tex. Crim. App. 1988) (holding that informal promise to help did not meet test, and distinguishing prior case in which prosecutor had made promise that was "positive rather than equivocal").

Holland told Ochoa several times that he wanted to help Ochoa. He also told him, "You're a juvenile. There's no reason on this deal that you shouldn't be

adjudicated as a juvenile. Basically what that means is that they're gonna get you help. You're not going off to prison or any horrible thing like that." But he then told Ochoa that it was "the people in the district attorney's office" who would be making the decision.

"A 'prediction about future events' is not the same as a 'promise.'" *Medrano v. State*, 579 S.W.3d 499, 504 (Tex. App.—San Antonio 2019, pet. ref'd) (quoting *Mason v. State*, 116 S.W.3d 248, 260 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)). Further, "[g]eneral, non-specific offers to help a defendant are unlikely to elicit a false statement by a suspect," and such general offers or general statements about how a confession might result in more lenient treatment will not render a confession invalid. *Drake v. State*, 123 S.W.3d 596, 603 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Although we have some concerns about Holland's telling Ochoa that there was no reason why he could not be adjudicated as a juvenile, his statements did not constitute a positive promise. *See Alvarez v. State*, 649 S.W.2d 613, 620 (Tex. Crim. App. 1982) (op. on reh'g) (considering district attorney's statement to defendant to "go ahead and give the statement. Let's get this thing all straightened up and you can probably go home," and stating that the use of the word "probably" made it "doubtful whether the remark represented a 'promise'"); *Vasquez v. State*, No. 13-19-00164-CR, 2020 WL 5053221, at *3 (Tex. App.—Corpus Christi–Edinburg July 9, 2020, pet. ref'd) (mem. op., not designated for publication) (concluding that there was no promise when officer stated to defendant, "I can help you, like I said if you ask for

forgiveness, people will give it to you and they will get you help," but also told the defendant that he did not know what was going to happen). Accordingly, Holland's statements did not render Ochoa's statement involuntary.

Ochoa argues that "[t]here is a significant showing the appellant could have believed the statements were sanctioned by someone in authority" because Holland said that he was there investigating the case on behalf of the governor and because Holland advised him that "he was bringing in someone that would help Holland in helping [Ochoa]" and explain his rights to him, and that someone was Johnson. Ochoa contends that to a juvenile, these misrepresentations by Holland appear as if someone in authority had sanctioned his contention that there was no reason why Ochoa should not be adjudicated as a juvenile. As we have said, however, Holland informed Ochoa that it was people in the district attorney's office who would decide how to proceed with the case—not the governor and not Johnson.[10]

Ochoa was not in custody for the part of the interview that occurred before Johnson provided him with the statutory warnings, and neither Johnson's additional statements while providing the statutory warnings nor Holland's assertions about

---

[10]Further, Holland's statement about Ochoa's being adjudicated as a juvenile was made in the part of the interview that occurred after Johnson had come in, said that Ochoa was there as a witness, explained Ochoa's rights, and left. Nothing in Johnson's discussion with Ochoa indicated that he had any authority to decide whether Ochoa would be adjudicated as a juvenile or that he had an opinion on the matter.

getting Ochoa help or the matter's being handled as a juvenile matter made Ochoa's post-warnings statement involuntary. We overrule Ochoa's first issue.

**E. Evidence Derived from the Statements**

In his second issue, Ochoa contends that because his statement was obtained by coercion, the evidence obtained as a result of the statement should have been suppressed. As Ochoa points out, if a statement was obtained by coercion, evidence obtained as a result of that statement may be suppressed. *See Funes v. State*, 630 S.W.3d 175, 182 & n.6 (Tex. App.—El Paso 2020, no pet.)

Ochoa first argues, with no citation to authority, that being misadvised of his rights by the magistrate was "tantamount to coercion." He also argues that the promises that Holland made to him "were coercive to [him,] a 14-year-old child who was being interviewed, especially in light of [his] being misadvised of his *Miranda* rights." We have already rejected his argument that the magistrate's warnings and Holland's assertions rendered his statement involuntary.

Ochoa further contends under this issue that the environment of and the manner in which Holland conducted the interview was coercive. Ochoa's complaint is that he was alone in the room with Holland, the door was shut, Holland was armed, and "[w]hen, during the interview [Ochoa] would fail to answer questions or not respond to Holland, Holland would draw closer to [Ochoa], touching him while he was backed into the corner of the room."

31

Ochoa was only fourteen when Holland interviewed him. Holland was armed, the interview room was small, Ochoa sat in a corner flanked on either side by a table and a chair with Holland in front of him, and Holland repeatedly put his hands on Ochoa. While these circumstances showed persistent attempts at persuading Ochoa to talk, none of them show that Ochoa's will was overborne. Nothing in the video indicated that Ochoa was not capable of understanding what was happening or what was said to him. He was not threatened or deprived of food or sleep. *See Barney v. State*, 698 S.W.2d 114, 121 (Tex. Crim. App. 1985). The interview did not last more than three hours from its start until Ochoa's confession, including the time in which he was alone in the room waiting for Johnson. *See Sandoval*, 665 S.W.3d 496 at 523. Further, at one point in the interview, Holland asked Ochoa why he had previously been suspended from school, and Ochoa told him, "I don't want to talk about that," indicating that Ochoa understood that he could choose not to answer questions. We hold that Holland's interview technique was not coercive such that Ochoa's confession was unlikely to have been the product of an essentially free and unconstrained choice. We overrule Ochoa's second issue.

## II. Prosecutor's Closing Argument

In Ochoa's third issue, he argues that the trial court erred by denying a mistrial when the prosecutor improperly commented on Ochoa's failure to testify.

### A. Background

In closing arguments, the prosecutor told the jury,

And, ladies and gentlemen, this is the evidence in the case. They—they've described this as an investigation that we didn't thoroughly do, and I disagree. We've got—we brought you 13 witnesses. We spent Tuesday, Wednesday[,] and Thursday presenting evidence to you guys. We put into evidence 100—about a hundred pieces of evidence, including a confession, including people that tested DNA.

All these things, and it was a thorough investigation. And every part of the investigation pointed to nobody else except [Ochoa]. And, ladies and gentlemen, [Ochoa] *knows he's guilty of this.* [Emphasis added.]

Appellant requested a mistrial on the basis that the prosecutor's statement was "a comment on [Ochoa's] failure not to testify in this case by saying what he knows and what he doesn't know." The trial court denied the motion but instructed the jury to "disregard the last statement of the prosecutor."

**B. Analysis**

A prosecutor may not comment on a defendant's exercise of his or her constitutional right not to testify. *Canales v. State*, 98 S.W.3d 690, 695 (Tex. Crim. App. 2003); *Robbins v. State*, No. 02-14-00236-CR, 2015 WL 831458, at *6 (Tex. App.—Fort Worth Feb. 26, 2015, no pet.) (mem. op., not designated for publication). Instead, a prosecutor is limited to argument that falls into one of four areas: "(1) summation of the evidence; (2) reasonable deductions from the evidence; (3) [an] answer to the argument of opposing counsel; and (4) [a] plea for law enforcement." *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011); *see also Polk v. State*, No. 02-16-00051-CR, 2016 WL 6519120, at *2 (Tex. App.—Fort Worth Nov. 3, 2016, no pet.) (mem. op., not designated for publication).

Here, the prosecutor's argument was a response to Ochoa's defense that the case had not been properly investigated and was a comment on the evidence in the case, including the evidence that Ochoa had confessed. *See Head v. State*, No. 03-10-00414-CR, 2013 WL 1831576, at *8 (Tex. App.—Austin Apr. 24, 2013, no pet.) (mem. op., not designated for publication) (stating prosecutor was allowed to respond to defense counsel's argument). The language used was not manifestly intended or of such a character that the jury would have considered it to be a comment on Ochoa's failure to testify. *See Canales*, 98 S.W.3d 690 at 695. However, even if the statement was an improper comment on Ochoa's failure to testify, the trial court cured any harm by instructing the jury to disregard the comment. *See Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011); *Davis v. State*, 645 S.W.2d 817, 818–19 (Tex. Crim. App. 1983); *King v. State*, 656 S.W.2d 544, 547 (Tex. App.—Corpus Christi 1983), *aff'd*, 675 S.W.2d 514 (Tex. Crim. App. 1984). We overrule Ochoa's third issue.

## III. Statutes' Constitutionality

In Ochoa's fourth issue, he challenges the constitutionality of Texas Penal Code Section 22.021 and Texas Government Code Section 508.145 as applied to him. He asserts that he was prosecuted under Penal Code Section 22.021 and that Subsection (f) of that statute increased the minimum sentence to twenty-five years' confinement, and consequently, upon conviction, under Texas Government Code Section 508.145, he was not eligible for release on parole. *See* Tex. Penal Code Ann. § 22.021 (aggravated sexual assault of a child under six); Tex. Gov't Code Ann.

§ 508.145 (providing that an inmate is not eligible for parole if serving a sentence for an offense punishable under Penal Code § 22.021(f)). Thus, he asserts, he was subject to a possible sentence of life without the possibility of parole, and as such, under *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 2034 (2010), those statutes are unconstitutional as applied to him, and he received an unconstitutional sentence. In other words, he argues that because, under the statutes, he could have received a sentence of life without parole, the statutes are unconstitutional as applied to him.

*Graham* established a categorical rule that juvenile offenders may not be sentenced to life without parole. *Id.* at 79, 82, 130 S. Ct. at 2032–33, 2034. *Graham* does not address the constitutionality of a sentence that could have been considered but was not imposed. Ochoa was sentenced to confinement for fifty-five years, not life without parole. No authority holds that a statute denying a person parole for an offense committed as a juvenile—for which the person is sentenced to confinement for a shorter term than life—is categorically unconstitutional. *Graham* does not make his sentence unconstitutional or make the challenged statutes unconstitutional as applied to him. We overrule his fourth issue.

## Conclusion

Having overruled Ochoa's issues, we affirm the trial court's judgments.

35

/s/ Mike Wallach

Mike Wallach

Justice

Publish

Delivered: July 20, 2023